This cause grows out of a dispute between landlord and tenant. Complainant, the tenant, charging technical error in a distress and impounding for rent, prays that his landlord be enjoined from further interference with the removal from the demised premises of seized store fixtures, that his lease be declared void and canceled, that he be awarded damages as for an unlawful eviction, and that the rights of all parties be adjudicated. Defendant Abraham J. Rovner, one of the owners of the premises demised, joins in the prayer of complainant that the rights of all parties be determined, and by way of counter-claim seeks a permanent injunction against any interference with a sale of the fixtures under the distress.
Both a multiplicity and a circuity of actions seemed inevitable when complainant filed his bill. The tenant, a resident of the State of Pennsylvania, had attempted to dispose of all his property in the leased Camden, New Jersey, store by an auction sale. The sale was interrupted and a distress made upon the store fixtures which had then not been offered for sale. Notice was given of the landlords' claim for rent and of the distress, notwithstanding which, complainant's auctioneers requested and accepted bids for the store fixtures. The four successful bidders claimed title to the fixtures, and the auctioneers made claim for services rendered. The tenant refused to recognize the legality of the distraint, and the landlords refused to permit removal of the fixtures. A constable, acting for the landlords, placed a padlock upon the door of the premises and the auctioneers then locked the door with two additional locks.
Co-owners of the store property with Mr. Rovner are Dora Rovner his wife, and Gertrude Handle. Of these three only Mr. Rovner is a party to this suit. The successful bidders at the auction sale of the store fixtures were I. Abramson, Nick Morelli, George Comen and Joseph Davis. Complainant's auctioneers were Jack Caskey and Abel J. Caskey, who trade as Associated Auctioneers. The four bidders and the auctioneers were made parties defendant in both the bill and the counter-claim and counsel for all except George Comen acknowledged service of process. Decrees proconfesso were *Page 95 
taken against all of them by complainant and by the counter-claimant. We are, therefore, presently concerned with the controversy between landlord and tenant.
The facts essential to a decision are not in substantial dispute. Prior to February 10th, 1942, complainant had occupied 1121 Broadway, Camden, New Jersey, as a tenant from month to month; therein he had conducted a meat and grocery business, and, on that day, he was $200 in arrear for rent. The owners consented to permit him to liquidate this debt in eight monthly installments of $25 each, such installments to be paid with future rent; a lease was executed; the term fixed was two years from March 10th, 1942, rent to be paid monthly in advance to Barney B. Brown, attorney for the landlords — $175 per month for the first eight months and $150 for the remaining sixteen months. The lease recited that it was being made by "A.J. Rovner, agent for owners."
Complainant, in the negotiations for the lease, was represented by his son Harold J. Elkman, a member of the bar of Philadelphia, Pennsylvania. April 15th, 1942, the latter advised Mr. Brown that complainant was seriously ill and wished to dispose of his meat and produce business; on May 2d 1942, the business was discontinued and thereafter the store was closed. On May 7th, 1942, Harold J. Elkman informed Mr. Brown that he had engaged the defendant auctioneers to hold an auction sale of his father's stock of merchandise and the store fixtures in the demised premises. The sale was advertised to be held at the store May 19th, 1942, at 10:30 A.M. On May 15th, 1942, Mr. Brown communicated with Harold J. Elkman and demanded payment of $175 which, under the terms of the lease, had become due May 10th, 1942. Mr. Elkman replied that he would meet Mr. Brown at the auction sale and there pay the rent. At the store, on the morning of the auction sale and in advance thereof, Mr. Brown again asked Harold J. Elkman to pay the rent in arrear and to arrange for security for payment of such further rent as might become payable under the terms of the lease. Mr. Elkman refused to pay the rent demanded and refused to give security.
Mr. Rovner, who had accompanied his attorney, accepting *Page 96 
the fact that complainant was seriously ill, consented that sale be made by complainant's auctioneers of the perishable goods and other merchandise in the store. The amount bid and paid therefor was in excess of $400. When the sale of merchandise had been concluded, Mr. Brown addressed Mr. Elkman saying: "You have sold the groceries for $400, what are you going to do about the rent?" Mr. Elkman refused to do anything. Mr. Brown then publicly announced that the owners of the premises claimed a lien for unpaid rent for one year and that, if the sale continued, anyone who bid for the store fixtures would do so at his peril as the owners of the premises would not permit their removal. The auctioneers ignored this announcement and proceeded to offer the fixtures for sale. Bids were received and deposits accepted from the defendants I. Abramson, Nick Morelli, George Comen and Joseph Davis who had also been bidders and purchasers when the merchandise was sold. The total amount bid for the store fixtures was $979.60.
When Harold J. Elkman and the auctioneers refused to abandon the sale of store fixtures, Mr. Brown telephoned for a constable. The officer appeared before the sale had been completed and immediately made a list of the store fixtures, and then posted the list, with a notice of distraint and impounding, upon the door of the store. After all those who had attended the sale had left the premises, the constable placed a padlock upon the door; the auctioneers then locked the door with the door key and added a second padlock. On the following morning the door was unlocked to permit purchasers of merchandise to remove their property; the door was then again locked with the three locks; Mr. Brown retained the key to the constable's padlock and Harold J. Elkman the keys to the other two locks. The door has since remained so secured, except that a possible tenant was shown the premises by Mr. Brown with the consent of Harold J. Elkman. The store is still unrented and the fixtures remain triply locked therein.
It is admitted by complainant, indeed he alleges in his bill, that he was in arrear in payment of rent to the extent of $200 at the time the lease was executed; that only two *Page 97 
months' rent was paid thereafter; that one month's rent of $175 became due May 10th, 1942, and has not been paid; and that, under the fourth paragraph of the lease, the payment of future rent was accelerated when complainant attempted to remove his goods from the demised premises by auction sale. Complainant also admits that, when his landlords made their distress, they were legally entitled to distrain for one year's rent, $1,950. Notwithstanding these admissions, complainant, by interposition of technical claims, seeks to retain $400, the proceeds of the sale of merchandise, obtain $979.60 from the sale of the store fixtures, collect damages from Mr. Rovner — and escape payment of any rent whatsoever. Complainant makes no offer to do equity, and, obviously, a decree which would bring about the result he seeks would be most inequitable.
The technical grounds upon which complainant rests his case have been misconceived. They are based upon his assumption that a distress necessarily includes an impounding and the posting of the statutory notice. He asserts that his landlords' distress was unlawful because it was made, not by the three owners of the premises but by "A.J. Rovner and others;" that it was made for an amount exceeding one year's rent; and, that it was made subsequent to the sale of complainant's store fixtures and after title thereto had passed to the purchasers. These objections all relat to the posting of notice by the constable — after the distress had been effected by Mr. Brown and after the constable had impounded the goods by placing a padlock upon the door. Complainant's claim for damages is, in turn, based upon his contention that Mr. Rovner's act in causing the premises to be padlocked constituted an unlawful eviction of complainant, released him from liability for rent under the lease and made Mr. Rovner liable to him for the value of the fixtures seized and distrained and for the unlawful detention, with special damages for his costs and expenses. This contention, also, is based upon the conception that a distress necessarily includes not only an impounding but, as well, the posting of notice. It ignores the fact that the real controversy here is between landlord and tenant; that the tenant had advised *Page 98 
his landlord that he was going out of business; that he had actually ceased doing business; and that, in violation of the terms of the lease, he had attempted to dispose of chattels which were subject to a distress. It completely ignores the fact of Mr. Brown's public announcement and the legal right of a landlord to impound on the premises after such a distress made.
At common law a distress and an impounding were obviously separate and distinct steps taken to enforce rent service or payment. The early concept of rent was that of a service required to be rendered by a tenant to his landlord — a service "reserved" when the tenancy was created, a "thing" which remained in the giver or lessor after he had made the gift or lease. From the latter half of the thirteenth century, if not before, such service could be enforced by distress. The theory of this remedy was that of bringing compulsion to bear upon a person whereby he would be forced into doing something he should do, or leaving something undone he should not do. The right to distrain, it is said, arose out of what the English called the "right of self-help." (Incidentally, the Germans called it "fist-right," and it could be used by the lord to compel the tenant to perform military service.) The right of self-help at common law, however, never included the right of self-satisfaction. The lord might not sell the beasts or the chattels impounded; he might not even use them. When he had taken them, they were not in his possession; they were in custodia legis. 1 Poll. M., Hist. of Eng. pp.333-335; vol. 2 pp. 128, 572-576. 9 Am. Eng. Encyc. of Law
(2d ed.) 618.
At common law no precise act or form of words was ever considered essential to a distress, and a legal distress could be made without actual seizure. To make a distress it was sufficient if the landlord or his agent, for rent in arrear, took effectual means to prevent the removal of the chattels from off the demised premises; this the landlord or his agent could accomplish by a declaration at the premises that the chattels might not be removed until the rent debt had been satisfied. A distress having been made, the distrainor was required to take the chattels distrained (then also called the "distress") *Page 99 
to a public pound and there make them secure. These latter acts constituted the impounding.
The distinction between a distress and an impounding is reflected and emphasized in the early English decisions. Upon it depended substantial rights and remedies of the parties. In the leading case of Wood v. Nunn, 5 Bing. 10; 130 Eng. Reprint962, a landlord to whom rent was past due, hearing his tenant and a stranger disputing about the ownership of a lathe on the demised premises, entered, laid hands on the machine and said: "I will not suffer this or any of the things to go off the premises till my rent is paid." The Chief Baron who originally heard the case said it would be a strange state of law if a landlord, finding the goods on the premises in peril of being removed, could not commence a distress at once, and complete the formal part of the proceeding afterwards. On appeal, Chief-Justice Best declared: "The distress commenced when the landlord came on the premises, and said: `This shall not go till my rent is paid.' From that time the property was in the custody of the law, and being improperly removed, the landlord had a right to get it back."
In Knowles v. Blake, 5 Bing. 499; 130 Eng. Reprint 1154, a son of a landlord, seeing horses trespassing, started to drive them to the pound. The legal point pressed before the court was that no sufficient distress had been taken, "no declaration of any intention to distrain having been made at the time." Chief-Justice Best declared: "* * * we all think that the distress was sufficiently made, for no precise act or form of words is essential to a distress."
In Cramer v. Mott, L.R. 5 Q.B. 357, a landlord's wife met men in her home just outside the door of the room of a tenant; the men were seeking to remove a piano sold to the tenant but not fully paid for; she said: "The piano shall not be taken away till our rent is paid." Chief-Justice Cockburn declared: "I think there need not be an actual seizure to create a distress; it is enough that the landlord or his agent takes effectual means to prevent the removal of the article from off the premises, on the ground of rent being in arrear; and he does this when he declares that the article *Page 100 
shall not be removed till the rent is paid." Mr. Justice Blackburn, concurring, said: "I think, both on principle and authority, the refusal to allow an article to leave the premises, unless the rent in arrear be paid, amounts to a distress."
In Dod v. Monger, 6 Mod. 215; 87 Eng. Reprint 967, the landlord entered the leased dwelling and seized "upon some goods as a distress, in the name of all the goods in the house." Chief-Justice Holt held this to have been a good distress of all. See, also, Swann v. Earl of Falmouth, 8 B. C. 456; 108 Eng.Reprint 1112.
The right of a landlord to distrain for rent, as that right had been established in England before our Revolution, has not been universally accepted by our states. However, the general rule declared in 9 Am. Eng. Encyc. of Law 650, is: "It is sufficient if the landlord gives notice of his claim for rent and declares that the goods which he names shall not be removed from the premises until the rent is paid." See, also, 36 C.J. 571 ¶1673; p. 534 ¶ 1576, and 32 Am. Jur. 486 ¶ 613.
New Jersey has always favored distress as a means of collecting rent due. In "An act concerning distresses," enacted by the Council and General Assembly of New Jersey on March 16th, 1795 (Paterson's Laws, p. 172), the enacting clause of section VI is introduced with these words: "Whereas the most useful and ready way for recovery of arrears of rent is by distress, yet such distresses not being to be sold, but only detained as pledges for enforcing the payment of such rent, the persons distraining have little benefit thereby; for remedy whereof," c. Mr. Justice Minturn, in Commercial Credit Co. v. Vineis, 98 N.J. Law 376, spoke of the "exceptional privilege" of the landlord, "conferred by ancient law and recognized by statute of seizing and selling, within a limited period, the goods of his tenant found upon the demised premises."
In this state our legislature and our courts have also carefully preserved the distinction between a distress and an impounding. R.S. 2:49-4 provides that "beasts distrained" "shall be put in open pound." and R.S. 2:49-5, that chattels "distrained or taken by distress" at one time "shall not be *Page 101 
impounded" in several places. R.S. 2:58-40 is introduced with these words: "A person lawfully taking a distress for rent may impound or otherwise secure the distress so made, on the part of the premises most convenient for the purpose," c. R.S. 2:58-47
permits the recovery of double the value of the property illegally "distrained" and sold, while R.S. 2:58-46 permits recovery of treble damages against one who breaches the "pound" or rescues the property "distrained" and "impounded."
Our Supreme Court, in Lipinski v. Frank, 12 N.J. Mis. R.174; 170 Atl. Rep. 608, regarded the distinction. It held a "distraint" to have been great and unreasonable and said the landlord would therefore be without right "in impounding the goods."
In Newell v. Clark (Supreme Court), 46 N.J. Law 363, Mr. Justice Depue declared: "No precise act or form of words is essential to a distress, and a distress may be made without actual seizure." In that case a notice of the distress taken was given to the tenant. Such notice was not, however, essential to an effective distress. In Tancred v. Leyland, 16 Q.B. 669; 117Eng. Reprint 1036, one of the questions before the court was whether the common law cast a duty on a landlord distraining to inform the tenant of the correct amount of rent for which the distress was being made. The court, citing authorities, said: "We think that the common law casts no such obligation on the distrainor. It has been expressly laid down that, if the lord distrain for rents or services, he has no occasion to give notice to the tenant for what thing he distrains; for the tenant, by intendment, knows what things are in arrear for his lands." This rule is thus stated in 32 Am. Jur. 508 ¶ 643: "No notice to the tenant of a distraint for rent is required to perfect a possessory lien valid at common law, the requirement of noticebeing simply a prerequisite to the right of sale given bystatute." (Italics mine.) Irving Trust Co. v. Burke
(C.C.A.), 65 Fed. Rep. 2d 730; 88 A.L.R. 877, 882.
The posting of notice of the distraint and impoundment had its inception in the act of 2 Wm. Mary st. 1 c. 5 s. 3. This statute was enacted by Parliament after an action, called *Page 102 Replegiare, had been created and had been accepted as a convenient medium for the settlement of disputes between landlords and tenants over the enforcing of rent service by distress. It conferred upon a distrainor the right to sell chattels distrained, but required that notice of the distress and impounding, with the cause of such taking, be posted in a conspicuous place on the demised premises. The tenant or the owner of chattels distrained was thus appraised of the proceeding and afforded opportunity to repossess his property.
The sale of distrained chattels was specifically authorized in New Jersey by the act of March 16th, 1795, supra. Section 6, in the language of 2 Wm. Mary, provided that notice of the distress, with the cause of the taking, be left at the chief mansion-house or other most notorious place on the premises charged with the rent. It reserved to the tenant or owner of the chattels distrained a period of ten days within which to institute replevin proceedings. If such proceedings were not instituted then, after the expiration of ten days, a formal appraisement of the chattels was required to be made and five days' public notice given of the sale. The provisions of the Distress Act of 1795 have come down to us practically unchanged. See title 2, chapters 49, and 58 of the Revised Statutes of 1937, and particularly R.S. 2:58-38 and 2:58-39.
The first notice posted by the constable contained an obvious error. The amount of rent claimed therein was $2,100. It is evident that someone, in the emergency created by the refusal of Harold J. Elkman and the auctioneers to abandon the sale of the store fixtures, arrived at this total by calculating the rent for twelve months at $175 per month, instead of six months at $175 per month and six months at $150 per month. However, the notice contained more than mere figures and complainant could not have been mislead to his disadvantage. The notice read:
"Twenty-one Hundred Dollars ($2100.00) being rent for one year now due under your lease dated February 10, 1942, for premises 1121 Broadway, Camden, New Jersey."
When this notice was posted the error was discovered and a corrected notice substituted. Complainant seeks to take advantage of the error contained in the first notice. Here *Page 103 
again he argues that the posting of this notice was a part of the act of taking the distress, and that, therefore, the distress was "a great and unreasonable distress." So contending, he asks that damages be awarded him under R.S. 2:49-1.
As I have demonstrated, complainant errs in his major premise; the posting of the notice was not requisite to the distress. To repeat: When Mr. Brown made his announcement he declared, without specifying any amount, that a lien for one year's rent was claimed. Complainant admits that one year's rent had become due and that the owners of the property were legally entitled to distrain therefor. He would be presumed to know what rent was in arrear, but admits actual knowledge of the amount due; he does not suggest or argue that he was misled or disadvantaged by either the oral notice or the first posted notice.
Complainant has made no tender whatsoever. It has been said that if a tenant conceives that a landlord has distrained for more rent than is due, the tenant's proper course is to tender the amount really due, and if the landlord refuses to accept that sum, to replevy the goods and try the disputed question of amount in an action of replevin. 2 Chitty on Pldgs. (16th Am. ed.)505, note 1, citing Glynn v. Thomas, 11 Exch. 870; 25 L.J.Exch. 125; 156 Eng. Reprint 1085; 7 Encyc. of Pl. Pr. 30 ¶ 4.
In Glynn v. Thomas, Coleridge, J., said: "Now as some rent was due, the taking was lawful; and as the taking was lawful, so was the detention until the sum really due, with enough to cover the lawful charges, was tendered." Then, citing Gulliver v.Cosens, 1 C.B. 788, the court said: "* * * in the present case the plaintiff, for the same reason was equally bound to make the tender; he was in arrear with his rent, and therefore first in default: by law he must be taken to know the amount for which he was in arrear, and the landlord, when he distrains, is not bound to inform him." In the instant case a tender might be even more logically required of complainant, who has submitted his case to equity. It should also be noted that R.S. 2:58-38 does not require a notice of the distress taken to be posted immediately. The words of the statute are: "If the tenant or owner of property distrained for rent shall not, within ten days next after the distress taken and notice *Page 104 
thereof, with the cause of the taking * * * replevy the same,"c. In Crucible Steel Co. v. Polack Tyre and Rubber Co.,92 N.J. Law 221; 104 Atl. Rep. 324, our Court of Errors and Appeals considered this section of the Distress Act. Mr. Justice Kalisch, speaking for the court said (at p. 230): "After the expiration of the ten days the landlord may take steps to sell the property distrained upon, but the statute is silent, as here, how soon after the expiration of the ten days such steps shall be taken. In either case a fair construction, for the purpose of carrying into effect the legislative intent, would be that the requirements of the section must be performed with due diligence and within a reasonable time."
To summarize: Complainant chose the forum and his form of remedy, and all the other parties to this cause, except George Comen, have submitted themselves to the jurisdiction of the court. Decrees pro confesso were taken against all except the landlord and the tenant; their dispute alone remains to be adjudicated. The landlord's right to distrain is admitted: That right was exercised and a legal distress was effected when Mr. Brown, as attorney for the owners, publicly announced that a lien was claimed for one year's rent, and that no one would be permitted to remove the store fixtures; Mr. Brown and Mr. Rovner were there to enforce the warning. The distraint was not unreasonable nor was it too great, for the rent in arrear greatly exceeded the total amount bid for the fixtures. Bidders at the sale, put upon notice by Mr. Brown, could not become bona fide
purchasers, and they made no tender of the rent due. A legal distress having been taken, the impounding of the chattels upon the premises was proper, and the landlord was entitled to proceed under the statute to sell the store fixtures. That, he has been prevented from doing because of the two locks placed and maintained upon the door by complainant and his agents.
For the reasons stated, the relief sought by the complainant should be denied; a decree in favor of the counter-claimant will, therefore, be advised to permanently restrain any interference with the sale of the store fixtures distrained, so long as the proceedings for their sale, and the sale, are had in accordance with the statute. *Page 105